UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DANIEL A. SCHILLINGER,

        Plaintiff,

        v.                                      Case No. 23-cv-1350-bhl

KWON C. YANG,

        Defendant.

## DECISION AND ORDER

Plaintiff Daniel A Schillinger, who is representing himself, is proceeding on an Eighth Amendment deliberate indifference claim in connection with allegations that Defendant Dr. Kwon Yang refused to treat his Temporomandibular Joint (TMJ) pain at the Racine Correctional Institution. Dkt. Nos. 1 & 8. This matter comes before the Court on the parties' cross-motions for summary judgment. Dkt. Nos. 30 & 34. Because the facts in the record would not allow a reasonable jury to find in Schillinger's favor that Dr. Yang was deliberately indifferent towards Schillinger's TMJ pain, the Court will grant Dr. Yang's motion, deny Schillinger's motion, and dismiss this case.

## UNDISPUTED FACTS

Schillinger is an inmate at the Racine Correctional Institution, where Dr. Yang is a full-time dentist. Dkt. No. 36, ¶¶1-2. Schillinger has a long history of Temporomandibular Joint (TMJ) pain, which causes a popping sensation in his jaw and difficulty opening his mouth to eat food. *Id.*, ¶¶22-44; *see also* Dkt. No. 40, ¶¶ 21 & 23. TMJ pain is hard to diagnose but is typically caused by misalignment of the discs in the joint, damaged cartilage in between the joint, or sudden

impact to the area. Dkt. No. 36, ¶¶7-10. Depending on the symptoms, TMJ pain can be considered a dental problem, a medical problem, or both. *Id.*, ¶14. Dentists, oral surgeons (OS), and ear, nose, and throat doctors (ENTs) all work on TMJ disorders. *Id*. The Department of Corrections (DOC) does not have a TMJ specialist on staff. *Id.*, ¶¶15-16.

In November 2022, Schillinger asked for an appointment with Dr. Yang after physical therapy for his TMJ pain, ordered by Dr. Urbanowicz (not a defendant), proved ineffective. *Id.*, ¶¶54-56. Dr. Yang placed Schillinger on the "Essential List" on November 7, 2022. *Id.*, ¶56. The Essential List is apparently a waiting list for inmates who need certain dental procedures. Dr. Yang explains that the dental department uses the Essential List to schedule in-person appointments. *Id.*, ¶57.

About a month and a half later, on December 21, 2022, Dr. Yang examined Schillinger in person in connection with his complaints of TMJ pain. *Id.*, ¶59. Based on the examination, Dr. Yang wanted to prescribe Flexeril (a muscle relaxant) to treat the TMJ pain. *Id.*, ¶61. Dr. Yang explains that Schillinger was allergic to non-steroidal anti-inflammatory drugs (NSAIDs) and Dr. Urbanowicz had already concluded that physical therapy didn't help. *Id*. Schillinger's existing prescriptions made prescribing Flexeril problematic. *Id*. Schillinger was already taking an antidepressant called Venlafaxine and Flexeril was contraindicated with Venlafaxine. *Id*. Accordingly, Dr. Yang asked the Psychological Services Unit (PSU) whether they would agree to change the antidepressant prescription from Venlafaxine to Amitriptyline. *Id.*, ¶¶60-61. PSU agreed to make the change but Schillinger refused to consent, insisting that Amitriptyline did not work for him. *Id.*, ¶¶64 & 67. Because Dr. Yang could not prescribe an NSAID (due to allergy) or Flexeril (due to Schillinger's refusal to change the contraindicated prescription), he turned to a third option and offered Schillinger an occlusal appliance, otherwise known as a "night guard"

2

or a "bite splint." *Id.*, ¶¶67. Dr. Yang explains that an occlusal appliance repositions the jaw and can relieve pressure on the TMJ. *Id.*, ¶¶12, 24-26, 68, & 80. Schillinger refused the occlusal appliance as well, claiming he didn't grind his teeth. *Id.*, ¶67.

During this time period, between November 2022 and January 2023, Schillinger filed several Dental Service Requests (DSRs), Health Service Requests (HSRs), and oral requests for: (1) a TMJ specialist; and (2) surgery. *Id.*, ¶¶55-67. Dr. Yang explains that both options required the DOC Dental Director to give "Class 3 Authorization" and prison policy required Dr. Yang to first exhaust all more conservative treatments before requesting that authorization. *Id.*, ¶78. Dr. Yang further explains that the available conservative options included an occlusal appliance, physical therapy, and prescription medication. *Id.* Schillinger had rejected two out of three conservative treatment options at that time.

In February 2023, Schillinger agreed to slowly taper off Venlafaxine, so that he could try Flexeril. *Id.*, ¶69. But, by March 2023, Schillinger had changed his mind again, arguing that he had TMJ prior to starting Venlafaxine, so he wanted to stay on it. *Id.*, ¶70. Dr. Yang again suggested that Schillinger try an occlusal appliance, but he again refused. *Id.* Later, on March 21, 2023, Schillinger finally agreed to try an occlusal appliance, but the next available appointment to make a mold of his teeth was five months later, on August 24, 2023. *Id.*, ¶¶82 & 88. Dr. Yang explains that the typical timeframe to get an occlusal appliance (or any other prosthetic) through the DOC is actually 52 weeks, as outlined in DAI Policy #500.40.32, but he took affirmative steps to expedite Schillinger's request due to his continued complaints of pain. *Id.*, ¶¶83 & 84. Indeed, between March 2023 and August 2023, Schillinger had filed at least five DSRs complaining about TMJ pain. *Id.*, ¶¶75, 76, 79, 81, 82, & 90. Dental staff and/or Dr. Yang responded to each one with an explanation that he was on the appropriate waitlist to make a mold

3

of his teeth. *Id*., ¶90. Throughout this time, Dr. Yang could not prescribe medication because Schillinger was allergic to NSAIDs and refused to change the contraindicated antidepression prescription to be able to try the muscle relaxant. *Id*., ¶¶67.

On September 26, 2023, Schillinger finally received his occlusal appliance. *Id*., ¶96. Dr. Yang explains that it typically takes three to four weeks to receive the occlusal appliance after the mold is made. *Id*., ¶95. There was a slight delay in this case, however, because the Dental Lab created one type of occlusal appliance based on the mold of Schillinger's teeth, but after it actually created the occlusal appliance, it recommended something slightly different to account for Schillinger's deep overbite. *Id*., ¶93. Dr. Yang directed Schillinger to wear his occlusal appliance and perform his physical therapy exercises. *Id*., ¶98. Ultimately, even with the occlusal appliance and physical therapy exercises, Schillinger still reported TMJ pain. *Id*., ¶99. Accordingly, having exhausted the available more conservative treatments, on October 2, 2024, Dr. Yang wrote to the DOC Dental Director (not a defendant) seeking Class 3 Authorization for an appointment with the TMJ & Orofacial Pain Treatment Center in the City of Racine. *Id*., ¶¶99-100. The DOC Dental Director instructed Dr. Yang to fill out a Class 3 Authorization for Oral Surgery, which Dr. Yang did. *Id*., ¶100.

After pursuing Class 3 Authorization, Dr. Yang was notified that the oral surgeons used by the institution no longer evaluated TMJ pain. *Id*., ¶101. Dr. Yang was therefore instructed to refer Schillinger to an ENT instead. *Id*. Dr. Yang complied and made the referral to an ENT. *Id*., ¶¶101 & 106. Dr. Yang then discovered another issue with his Class 3 Authorization request; the specialist he wanted—the TMJ Center—would not accept the DOC's insurance plan. *Id*., ¶102. On December 15, 2023, Schillinger saw ENT Dr. Mallorie Bergstrom (not a defendant). *Id*., ¶104. Like Dr. Yang, Dr. Bergstrom also discussed conservative treatment options, but

4

ultimately believed that Schillinger need a follow-up appointment with the TMJ Center. *Id*. Dr. Bergstrom also recommended a soft, pureed diet, which Schillinger declined. *Id*., ¶105.

On December 19, 2023, Dr. Yang wrote to the DOC Dental Director explaining the circumstances of his efforts to treat Schillinger. *Id*., ¶106. He explained that he had been told that OS did not treat TMJ anymore, that both he and Dr. Bergstrom believed Schillinger needed a referral to the TMJ Center, and that the TMJ Center would not accept the DOC's insurance plan. *Id*. To try to surmount these obstacles, Dr. Yang looked into alternative providers. *Id*., ¶¶107-111. He directed his staff to contact the University of Wisconsin (UW), Dr. Mary Karkow, the Marquette Oral Surgery Department, and TMJ Pain Solutions. *Id*. UW referred its TMJ patients to dental, OS, and physical therapy; therefore, they could not be of assistance. *Id*., ¶107. Dr. Mary Karkow did not return Dr. Yang's call. *Id*., ¶110. The Marquette Oral Surgery Department reported that they only did wisdom teeth and implants, not TMJ. *Id*., ¶111. And TMJ Pain Solutions also would not accept the DOC's insurance plan. *Id*., ¶113. Dr. Yang then personally called the TMJ Center—the Provider that both he and Dr. Bergstrom had wanted—but the Center reiterated that it would not accept the DOC's insurance plan and that the service would have to be paid out-of-pocket at the time of service. *Id*., ¶109. At this point, the DOC Dental Director agreed to get involved and told Dr. Yang that he would inquire further up the chain of command to identify other options that might work. *Id*., ¶113.

About five months later, in May 2024, the issue with the availability of the TMJ Center finally resolved. *Id*., ¶¶114-118. Because the DOC's insurance was *processed* through a company in Michigan, Providers mistakenly believed the coverage was from an "out-of-state insurance" (rather than State insurance). *Id*., ¶118. To resolve this confusion, all DOC schedulers were then notified that, if a Provider refused DOC insurance, the scheduler needed to inform the

5

treating facility that the DOC had State insurance and that the coverage was merely processed by an out-of-state company. *Id*. Once this issue was resolved Schillinger was able to be treated at the TMJ Center. *Id*., ¶119.

On June 13, 2024, Schillinger finally visited the TMJ Center, where Dr. Connor Peck (not a defendant) diagnosed him with bilateral TMJ disc disorder with reduction, B TMJ arthralgia (pain in joint), and myofascial pain of masticatory muscles. *Id*., ¶120. In the end, after the lengthy delays, Dr. Peck ultimately recommended that Schillinger be treated with an occlusal appliance, the very same treatment Dr. Yang had already recommended and had already created for him in September 2023. *Id*., ¶124. Schillinger appears to be satisfied with his occlusal appliance and is not asking for any other medical care, but he seeks monetary damages for past pain and suffering. Dkt. No. 31 at 10.

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party asserting that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## ANALYSIS

The Eighth Amendment proscribes "deliberate indifference to serious medical needs of prisoners" amounting to "the unnecessary and wanton infliction of pain." *Stockton v. Milwaukee Cnty.,* 44 F.4th 605, 614 (7th Cir. 2022) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). To survive summary judgment, Schillinger must point to evidence that: (1) he suffered an objectively serious medical condition; (2) Dr. Yang knew of the condition and was deliberately indifferent to treating him; and (3) this deliberate indifference injured him. *Id*. "Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Id*. at 615. Indeed, Schillinger must show that Dr. Yang's medical decisions were "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)). Schillinger must show "no minimally competent professional" would have treated him as Defendants did. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

For purposes of this motion, the Court will presume that Schillinger's TMJ was an objectively serious medical condition. But no reasonable jury could conclude that Dr. Yang was deliberately indifferent towards it. To the contrary, the undisputed evidence shows that Dr. Yang undertook extensive effort to try to help Schillinger with his TMJ pain. Dr. Yang examined

Schillinger in person; attempted to prescribe medication to relax Schillinger's jaw muscles (which Schillinger rejected); offered an occlusal appliance (which Schillinger also initially rejected); responded to the DSRs; moved Schillinger up the waitlist to make a mold of his teeth (even though Schillinger caused the delay by initially refusing the occlusal appliance); sought and got approval for Class 3 Authorization; ordered every referral that was recommended (OS, ENT, and the TMJ Specialist); personally called the TMJ Center to confirm that they would not treat Schillinger due to his insurance; explored alternative providers (Dr. Karkow, Marquette Oral Surgery, the University of Wisconsin, and TMJ Pain Solutions); then ultimately succeeded in getting Schillinger seen by the TMJ Center, where a specialist ultimately recommended the same final treatment Dr. Yang had suggested more than a year earlier. Based on this record alone, no reasonable jury could conclude that Dr. Yang was deliberately indifferent towards Schillinger's TMJ pain.

Additionally, there is nothing in the record to suggest that Dr. Yang's treatment recommendations were anything but sound. Indeed, his treatment recommendations were the same as those made by Dr. Bergstrom (to go to the TMJ Center) and Dr. Peck (for an occlusal appliance). Schillinger acknowledges this point—that Dr. Peck ultimately ordered the same treatment that Dr. Yang had already recommended and provided since September 2023—but clarifies that his claim is limited to the Dr. Yang's conduct between March 2023 and August 2023. Dkt. No. 40. Assuming that limiting the Court's view of the facts is appropriate, even if the Court turns a blind eye to Dr. Yang's overall efforts to help Schillinger, it still does not save his claim. The record confirms that any delays or denials in treatment during this specific time period were caused by Schillinger's own uncertainty on whether or not he wanted to try the more conservative treatment options that Dr. Yang was required to explore before seeking Class 3 Authorization. Schillinger

initially rejected, then agreed to try, and then again rejected Dr. Yang's suggestion that he taper off Venlafaxine so he could try a muscle relaxant in an effort to resolve his pain. Schillinger similarly rejected and then agreed to try the occlusal appliance. Dr. Yang offered both treatment options as early as January 2023. That Schillinger vacillated on accepting these options and delayed his own treatment does not support a finding that Dr. Yang was deliberately indifferent.

Schillinger reiterates throughout his response materials that Dr. Yang continuously told him, "there is nothing I can do," regarding his TMJ pain. This statement was of course accurate in context. The record as a whole shows that Dr. Yang did in fact take a series of actions to try to help treat Schillinger's TMJ pain. He went above and beyond the minimum of his obligations by making personal phone calls to uncooperative Providers and relentlessly emailing the DOC Dental Director. Dr. Yang undertook extensive efforts to help Schillinger and took steps to overcome a series of obstacles, including some difficulties put in place by Schillinger himself. Dr. Yang's sentiment that he could "do nothing" is understandable given the constant barriers he faced. In the beginning, Schillinger stood in his own way and refused to try prescription medication and an occlusal appliance, both of which were required before Dr. Yang could request Class 3 Authorization for a TMJ specialist. After Dr. Yang was finally able to retrieve Class 3 Authorization, both TMJ specialists categorically refused DOC insurance. Dr. Yang's words of frustration and defeat would have been an accurate representation of the situation being out of his hands. It certainly was not an indication of deliberate indifference towards Schillinger's medical situation.

Schillinger's remaining arguments have no merit. He claims that Dr. Yang refused a TMJ specialist to "save money." There is nothing in the record to support that unsupported assertion. Dr. Yang made the request for a TMJ specialist several times, including placing a personal call to

9

one of the treatment centers, but both clinics refused the appointment due to insurance issues. This was not the result of any decision by Dr. Yang and was outside his control. Schillinger also states that the ENT appointment was unnecessary; that Dr. Yang could have re-ordered physical therapy; and that surgery could have been an early option. But inmates are not constitutionally entitled to the medical care of their choosing. *See Walker v. Wexford Health Sources, Inc.,* 940 F.3d 954, 965 (7th Cir. 2019) ("[A]n inmate is not entitled to demand specific care"). Additionally, Schillinger's disagreement with Dr. Yang's his use of medical judgment does not support a deliberate indifference claim. *See Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation.").

Based on the undisputed record, no reasonable jury could conclude that Dr. Yang was deliberately indifferent towards Schillinger's TMJ pain. Therefore, he is entitled to summary judgment. Accordingly, the Court will grant Dr. Yang's motion, deny Schillinger's motion, and will dismiss this case.

## CONCLUSION

For the reasons stated above, **IT IS HEREBY ORDERED** that Defendant's motion for summary judgment (Dkt. No. 34) is **GRANTED**; Plaintiff's motion for summary judgment (Dkt. No. 30) is **DENIED**; and this case is **DISMISSED**. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin on March 6, 2025.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.